# NELSON MADDEN BLACK LLP

475 Park Avenue South, Suite 2800
New York, New York 10016
Telephone: (212) 382-4300
nelsonmaddenblack.com

August 3, 2021

Hon. Cathy Seibel
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601

                Re:    *Finkelstein v. Kronick*, et al., Civil No. 7:21-4337

Dear Judge Seibel,

      Plaintiff, Rabbi Joshua Finkelstein ("Rabbi"), states his position in this letter pursuant to this Court's July 20, 2021 Order (Dkt. #54).

      Defendants' motion to dismiss is utterly without merit and should be denied in its entirety. Plaintiff meritoriously pled both diversity and federal question jurisdiction, as he permanently moved to New Jersey before filing the Complaint, and this case implicates the interpretation of the First Amendment. The meritorious nature of Plaintiff's case is further demonstrated by its similarity to *Kamchi v. Weissman*, a decision in which the board of a synagogue was held liable for interfering with a congregation's right to vote regarding its rabbi's employment, in violation of New York's Religious Corporations Law ("RCL") § 200.  125 A.D. 3d 142 (2d Dep't 2014).

      To prove domicile, a plaintiff must establish both (1) physical presence and (2) intent to remain indefinitely. *McKone v. State Tax Comm'n of State of N.Y.*, 111 A.D.2d 1051, 1053, 490 N.Y.S.2d 628, 630 (3d Dep't 1985). "No definite period of residence or specified length of time . . . is required to establish a domicile, but when coupled with . . . intent, any residence, even if it is only for a day or two, will be sufficient . . . ." *In re Strobel's Est.*, 200 Misc. 483, 486, 109 N.Y.S.2d 848 (Sur. Ct. Montgomery Cnty. 1951). The Rabbi was notified on May 6 that his employment with Montebello Jewish Center ("MJC") would end on May 20, and that he was required to vacate the parsonage on or before that date.  As a result, he moved into his New Jersey home – which he had owned since 2005 – on May 11. He filed his Complaint on May 13, 2021. The Rabbi has been residing and physically present there since May 11, thus satisfying the first element. It is ironic Defendants claim the Rabbi manufactured diversity when it was their illegal conduct in forcing him out of the parsonage which left him with no choice *but* to move back into his New Jersey home.

      For years the Rabbi intended to ultimately settle in New Jersey. Evidence provided to opposing counsel and that will be provided in Plaintiff's opposition papers demonstrates this, including a phone installation and a permanent change-of-address request. Defendants argue that the paychecks sent to Plaintiff's New Jersey address were undeliverable, but they were sent one day after the Rabbi submitted his change-of-address request.  Defendants also emphasize that the Rabbi put his house on the market, but this is irrelevant to his domicile when he filed the Complaint, when his New Jersey home was not on the market and he was living there.

Defendant's repeated use of the word "manufactured" to describe Plaintiff's diversity claim conflates two uses of the word. A plaintiff may "create" or "manufacture" jurisdiction by moving to a state to invoke the court's jurisdiction. *Morris v. Gilmer*, 129 U.S. 315, 324 (1889) (a " citizen can instantly transfer his citizenship from one State to another, and his right to sue . . . is none the less because his change of domicile was induced by the purpose of invoking . . . jurisdiction"). "Manufactured" as used in the case law refers to when a party "by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court," 28 U.S.C. § 1359, not when a party declines to name defendants who would defeat diversity. 28 U.S.C. § 1359 Notes ("the purpose of the assignee clause was to prevent the manufacture of Federal jurisdiction by . . . assignment"). Defendants may be arguing that not joining board members who would defeat jurisdiction violated 28 U.S.C. § 1359. But even if plaintiff "confine[d]" the defendants "to non-residents in order to [invoke] . . . jurisdiction," this does not "constitute such collusion as would cause the federal courts to refuse to entertain the action." *First Congregational Church & Soc'y v. Evangelical & Reformed Church*, 160 F. Supp. 651, 662 (S.D.N.Y. 1958). The Rabbi's domicile is also unaffected by the chance that he may obtain the requested relief. *Gilbert v. David*, 235 U.S. 561, 570 (1915) (plaintiff "probably did have, some . . . intention of returning to Michigan after the determination of certain litigation and the disposition of his property in Connecticut," but "a floating intention of that kind was not enough to prevent . . . Connecticut from becoming his domicile").

Defendants argue that Plaintiff does not have federal question jurisdiction because they are not state actors. But federal question jurisdiction is also implicated when the right asserted involves the construction of federal law. *T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964)("[e]ven though the claim is created by state law, a case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law"). Plaintiff's rights under the RCL, which "is governed and enabled by the First Amendment," Dkt. #41, ¶ 76, and which it seeks to vindicate here, hinge on an interpretation of just that law, as Section 200 of the RCL codifies MJC's First Amendment right to select its minister without trustee interference.

Plaintiff's common-law claim must not be dismissed, either. First, qualified immunity does not protect defendants who acted with malice. Defendants' argument that "there are no allegations of . . . intent to cause harm to Plaintiff" is baffling when the Complaint expressly alleges "all of Defendants' actions . . . have been pervaded with malice and ill-intent towards the Rabbi." Dkt. #41 ¶ 126; *see also* Dkt. #41 ¶¶ 59, 75, 100, 112, 127, 132, 133, 138, 143, 154, 155, and 159.

Defendants argue Plaintiff did not allege actual breach in his tortious interference claim. But the Complaint plainly states that "Defendants' illegal conduct . . . resulted . . . in the termination of the Rabbi's employment three years early." Dkt. #41 ¶ 139. Such breach is presently being addressed in arbitration. Additionally, the entire thrust of the Complaint was the Rabbi's improper termination by the membership, resulting directly from the Board's interference. *See also* Dkt. #41 ¶¶ 43-44, 106, 110-12, 135. Defendants also argue a corporate officer is not liable for a corporation's acts. But the cases cited were not governed by the RCL, which prohibits officers from interfering with a rabbi's tenure. *See Kamchi*, 125 A.D.3d at 145 (court erred in dismissing tortious interference claim when Board interfered with congregational vote on rabbi's contract in violation of RCL § 200).

Citing RCL § 25, Defendants argue that "the RCL specifically provides that the RCL does not trump a synagogue's bylaws." Dkt. #53 at 17. But RCL § 25 is expressly removed from applicability to congregational churches, of which MJC is one, by RCL § 27. *Walker Mem. Baptist Church v. Saunders*, 285 NY 462, 468-469 (1941). Further, "bylaws are invalid to the extent they conflict with Religious Corporations Law[.]" *Matter of Venigalla v. Nori*, 11 NY3d 55, 59 (2008).

Defendants argue the Complaint does not specify defamatory statements. But Plaintiff alleges that Defendants stated the Rabbi was "untruthful" and "interfered with the consolidation," is "all about the money," and "doesn't care about the Congregation." Dkt. #49 ¶¶ 58, 85, 89, 108, 147. Such statements are not subject to dismissal as opinions pursuant to *Kamchi*, 125 A.D.3d at 158.

Defendants also argue that the Board's statements were protected under the common interest privilege, but the privilege does not apply to statements made with malice. *Kamchi*, 125 A.D. at 159 (finding that statements undermining rabbi's authority and intended to interfere with his continued employment overcame the common interest privilege). That is precisely what happened here.

Plaintiff sufficiently states a claim for fraud. Plaintiff argues that Defendants misrepresented that Rabbi Kurland would serve as co-rabbi for a year, while Defendants say they believed it was true at the time. This discrepancy does not warrant dismissal but merely shows fact issues. Moreover, just because Defendants have no authority over Rabbi Kurland's contract does not mean they did not influence the process. Defendants also argue the Rabbi knew about consolidation since he talked with Defendants about the merger. But just because he had an idea it was forthcoming does not mean he knew when it would be filed; he certainly did not know it would assert no person had reason to object, or that it would fail to directly acknowledge its potential $475,000 liability to the Rabbi.

Lastly, Defendants argue that Plaintiff's claims should be arbitrated. But only the dispute between Plaintiff and MJC is subject to the arbitration clause in Plaintiff's contract with MJC. The RCL makes it clear that the relationship between the Rabbi and a congregation is governed by the congregation, not the Board. Indeed, the Board is expressly *prohibited* by the RCL from any involvement with the Rabbi's tenure, and under the First Amendment, "the hiring or firing of a minister is a matter 'strictly ecclesiastical,' and trustees cannot make a church's religious decisions." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 US 94, 119 (1952). Thus, no lawful agreement between the Rabbi and MJC could have contemplated an arbitration resolving claims between the Rabbi and the Board. Nor could the Board, as a matter of constitutional and statutory law, have been party to the arbitration agreement between the congregation and the Rabbi.

For these reasons, Defendants' motion should be denied in its entirety.

Respectfully submitted,

*Sarah E. Child*

Sarah E. Child

cc:   Mark A. Berman, Esq.
      Robin D. Fineman, Esq.